**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| CARL PEGNATORI and MONSTA ATHLETICS LLC, *a California Limited Liability Company*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 2:23-cv-01424-DCN |
| PURE SPORTS TECHNOLOGIES LLC, *a South Carolina Limited Liability Company*, | ) ) ) ) | **ORDER** |
| Defendant. | ) ) ) | |

The following matter is before the court on plaintiffs Carl Pegnatori ("Pegnatori") and Monsta Athletics LLC's ("Monsta Athletics") (together, "plaintiffs") motion for preliminary injunction, ECF No. 16. For the reasons set forth below, the court denies the motion.

## I.  BACKGROUND

This case arises from a patent dispute over softball bat technology. Pegnatori is the inventor of the floating core bat technology described and covered by U.S. Patent No. 9,005,056 (the "'056 Patent"). ECF No. 1, Compl. ¶ 7, see also ECF No. 1-1, U.S. Pat. No. 9,005,056 (filed July 30, 2013). Pegnatori is the President and primary partner of Monsta Athletics, which has the exclusive right to use the '056 Patent and marks bats which incorporate the '056 Patent with the 9,005,056-patent number (the "Patented Bats"). Compl. ¶¶ 8–10. The Patented Bats are described as having a "floating inner barrel" or "FIB" and includes the Monsta Athletics "TORCH" bat. Id. ¶ 13. The Monsta TORCH bat has a triple wall outer barrel and a short, inner barrel spaced from the inside

1

diameter of the outer barrel.  Id. ¶ 14.  The triple wall outer barrel has a thickness of

about 0.0190 inches ± 0.005 inches for manufacturing tolerances, and the inner barrel has

a thickness of about 0.095 inches and a length of about two inches.  Id. ¶¶ 14–15.  The

'056 Patent has two claims.[1]  ECF No. 1-1, col. 6, ll. 51–col. 7, ll. 10.  The claim at issue,

Claim 1, is for

> A bat, comprising:
>
>> [1] a tubular frame having a circular cross-section, the tubular frame
>> including a large diameter hitting portion, an intermediate
>> tapering portion, and a small diameter handle portion;
>>
>> [2] a tubular insert positioned within the large diameter hitting
>> portion, the insert having a circular cross-section, the insert
>> having first and second ends, the insert being separated from the
>> tubular frame by a void gap along the entire length of the insert,
>> the gap being largely of constant width, the gap having such
>> width so that the insert and tubular frame will elastically deform
>> in conjunction with each other when a baseball is struck;
>>
>> [3] a foam fitted within the insert, the foam protruding beyond the
>> first and second ends of the insert and expanding beyond the first
>> and second ends of the insert such that the diameter of the
>> expanded foam is greater than an outer diameter of the insert,
>> allowing the insert to be suspending within the tubular frame, to
>> move independently of the tubular frame, and to elastically
>> deform in conjunction with the tubular frame when a baseball is
>> struck to improve the rebound effect;
>>
>> [4] a knob covering an exposed end of the handle portion; and
>>
>> [5] a cap covering an exposed end of the hitting portion.

ECF No. 1-1, col. 6, ll. 51–col. 7, ll. 8.[2]

---

[1] Claim 2 is not at issue but the court provides it for completeness.  Claim 2 is in reference to Claim 1 and is for "[t]he bat according to claim 1 in which the foam is adhered to the tubular frame by an adhesive."  ECF No. 1-1, col. 7, ll. 9–10.

[2] Each of the descriptors that the court delineates as [1], [2], [3], [4], or [5] are known as "limitations."  Thus, Claim 1 has five limitations.

The '056 Patent describes the preferred embodiment[3] of the invention in Figure 1, which the court includes below, though an additional three figures are provided in the '056 Patent to explain the invention.  ECF No. 1-1, col. 5, ll. 42–60.



FIG. 1

ECF No. 1-1, fig. 1.  Figure 1 shows a sectional view through the center of a bat.  ECF No. 1-1, col. 4, ll. 13–14.  The shaded portion identified with "28" is high density foam, and the FIB described above is illustrated in the diagram with "20", which has no contact with the bat frame identified with "12".  ECF No. 1-1, col. 5, ll. 44–53.  The FIB freely moves within the hitting portion "14" to both absorb energy by elastic deformation and to dampen vibrations by compressing against the wall on the side opposite to the point of impact.  ECF No. 1-1, col. 5, ll. 54–60.  Monsta Athletics has fought off patent lawsuits filed by industry giants Wilson Sporting Goods and Easton Athletics.  ECF No. 16-3,

---

[3] An embodiment is the description of the production, use, practice, or expression of an invention in the patent application.

3

Pegnatori Decl. ¶ 16; <u>see</u> <u>Wilson Sporting Goods Co. v. Monsta Athletics, LLC</u>, Case No. 5:19-cv-00738 (C.D. Cal.); <u>Easton Diamond Sports LLC v. Monsta Athletics, LLC</u>, Case No. 5:21-cv-01626 (C.D. Cal.).

Defendant Pure Sports Technologies LLC ("Pure Sports") sells various sporting goods products including bats under its "HELLFIRE,' "SIDEWINDER,' and "SKYBOLT" brands.  Compl. ¶ 17.  All the bats include what Pure Sports describes as a "Power Amplification Device" or "PAD."  <u>Id.</u>  Pure Sports advertises that "[w]hen the bat hits the ball the barrel will compress and allow the PAD to amplify the force of the swing.  This causes a faster rebound, allowing for hits to go much further than a traditional bat."  <u>Id.</u> ¶ 42.  Pure Sports took a license to use the '056 Patent in 2019 and as a result Pure Sports has had knowledge of the '056 Patent since 2019.  <u>Id.</u> ¶¶ 22–23; <u>see</u> ECF No. 16-3 at 25.  The three-year license expired in 2022 and Pure Sports currently has no rights in or to the '056 Patent.  <u>Id.</u>  Even so, the Pure Sports HELLFIRE bat has a triple wall outer barrel and a shorter inner barrel and the respective thicknesses, diameters, and lengths match that of the Monsta TORCH bat.  Compl. ¶¶ 18–20.  An image of the HELLFIRE bat is included in the complaint to demonstrate the bat's similarity with the first, fourth, and fifth limitations of Claim 1:



<u>Id.</u> ¶ 30.  Plaintiffs also included an image of the inner tubular insert cylinder and spacer, which coincides with the second and third limitations of Claim 1:



Compl. ¶ 37.[4]  Plaintiffs allege that the Pure Sports bats offered for sale "infringe at least

claim 1 of the 9,005,056 Patent."  Id. ¶ 28.

On April 7, 2023, plaintiffs filed this lawsuit claiming infringement of the '056

Patent under 35 U.S.C. § 271 of the Patent Act and seeking: (1) a declaratory judgment

that Pure Sports infringed the '056 Patent; (2) damages for the infringement; and (3)

injunctive relief such that Pure Sports be preliminarily and permanently enjoined from

infringing the patent.  Compl. ¶¶ 24–49.  On June 15, 2023, plaintiffs filed the instant

motion for a preliminary injunction.  ECF No. 16.  On June 29, 2023, Pure Sports

responded in opposition, ECF No. 17, to which plaintiffs replied on July 6, 2023, ECF

No. 18.  Pure Sports filed a sur-reply without leave of court on July 19, 2023.  ECF No.

21.  The court held a hearing on this motion on August 8, 2023, where the Managing

Director, Founder, and Owner of Pure Sports Chris Osborne ("Osborne") testified under

oath.  ECF No. 23.  The transcript of that hearing is available.  ECF No. 24.  As such, the

motion has been fully briefed and is now ripe for review.

---

[4] Pure Sports has sent physical exhibits to chambers for the court to examine: (1)
Exhibit A: Pure Sports's PAD, ECF No. 17-2; (2) Exhibit B: a cross section of Pure
Sports's X22 bat barrel segment comprising PAD, ECF No. 17-3, and (3) Exhibit C:
plaintiff's FIB, ECF No. 17-4.  Plaintiffs introduced the physical exhibit of the PAD
photographed above at the hearing and Pure Sports testified that the orange-colored
PADs were those used in their prototypes, rather than the black-colored PADs used in the
final design and submitted to the court as ECF No. 17-2.  ECF No. 23.

## II.  STANDARD

### A.  Preliminary Injunction Standard

Federal Rule of Civil Procedure 65 authorizes federal courts to issue temporary restraining orders and preliminary injunctions.  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  United States v. South Carolina, 840 F. Supp. 2d 898, 914 (D.S.C. 2011) (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)), modified in part, 906 F. Supp. 2d 463 (D.S.C. 2012), aff'd, 720 F.3d 518 (4th Cir. 2013).  A party seeking a preliminary injunction must demonstrate that: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm, (3) the balance of hardships tips in its favor, and (4) the injunction is in the public interest.  Metro. Reg'l Info. Sys. v. Am. Home Realty Network, Inc., 722 F.3d 591, 595 (4th Cir. 2013) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)).  "To obtain a preliminary injunction under the Winter test, a movant must make a 'clear showing' of [the] four requirements."  Alkebulanyahh v. Nettles, 2011 WL 2728453, at *3 (D.S.C. July 13, 2011), aff'd, 454 F. App'x 231 (4th Cir. 2011); see also Dewhurst v. Century Aluminum Co., 649 F.3d 287, 290 (4th Cir. 2011) ("Winter thus requires that a party seeking a preliminary injunction . . . must clearly show that it is likely to succeed on the merits.") (internal quotation marks omitted).  As the Supreme Court has noted, a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter, 555 U.S. at 22.

### III.  DISCUSSION

Plaintiffs seek a preliminary injunction and therefore bear the burden of proving the four elements favor an injunction.  See Winter, 555 U.S. at 20.  The court, as umpire of this dispute, considers the parties' arguments in turn.

### A.  Likelihood of Success on the Merits

To establish a likelihood of success on the merits, a patentee must demonstrate (1) that it will likely prove that the defendant is infringing one or more claims of the patent at issue and (2) that at least one of the allegedly infringed claims will also likely withstand validity challenges presented by the defendant.  AstraZeneca LP v. Apotex, Inc., 633 F.3d 1042, 1050 (Fed. Cir. 2010) (quoting Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1351 (Fed. Cir. 2001)).  A plaintiff seeking a preliminary injunction "need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial."  Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017) (internal quotation marks omitted).  "[T]he estimated likelihood of success in establishing infringement is governed by Federal Circuit law, while the other factors are governed by the law of the regional circuit."  ABC Corp. I v. P'ship & Unincorporated Ass'ns Identified on Schedule "A", 52 F.4th 934, 941 (Fed. Cir. 2022) (internal citations and quotation marks omitted); BlephEx, LLC v. Myco Indus., Inc., 24 F.4th 1391, 1400 (Fed. Cir. 2022) ("[W]e give dominant effect to Federal Circuit precedent insofar as it reflects considerations specific to patent issues [and w]hether a patentee has shown a likelihood of success on the merits is one such area where we apply our own law." (citations and punctuation omitted)).  The Federal Circuit "views [a motion for a preliminary injunction] in light of the burdens and presumptions that will inhere at trial."  Titan Tire

Corp. v. Case New Holland, Inc., 566 F.3d 1372, 1376 (Fed. Cir. 2009) (noting that, at trial, "an issued patent comes with a statutory presumption of validity under 35 U.S.C. § 282"). "A preliminary injunction should not issue if an alleged infringer raises a substantial question regarding either infringement or validity, i.e., the alleged infringer asserts an infringement or invalidity defense that the patentee has not shown lacks substantial merit." AstraZeneca, 633 F.3d at 1050 (citing Genentech, Inc. v. Novo Nordisk A/S, 108 F.3d 1361, 1364 (Fed. Cir. 1997)).

Plaintiffs argue that Pure Sports's bats plainly infringe on the valid '056 Patent; whereas Pure Sports argues that plaintiffs are unable to show infringement and that Pure Sports is likely to prevail on its defense that the '056 Patent is invalid. ECF Nos. 16-1 at 11–20; 17 at 3. The court examines the parties' arguments in turn, ultimately finding that plaintiffs have not met the high bar required for a preliminary injunction to issue— namely, they have not shown a substantial likelihood of success on the merits of their infringement claim.

### 1. Infringement

The infringement analysis entails two steps, "the first of which is construing the claims, and the second of which is comparing the properly construed claims to the accused products." Philip Morris Prods. S.A. v. Int'l Trade Comm'n, 63 F.4th 1328, 1348 (Fed. Cir. 2023) (internal quotation marks omitted). Thus, the court begins with claim construction before turning to a comparison of the construed claims against Pure Sports's accused products.

### a. Claim Construction

The purpose of claim construction is to "determine[e] the meaning and scope" of a patented invention to define the patent owner's rights.  Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996).  The proper construction of the patent claims is an issue of law "exclusively within the province of the court," id., and "a correct claim construction is almost always a prerequisite for imposition of a preliminary injunction," Chamberlain Grp., Inc v. Lear Corp., 516 F.3d 1331, 1340 (Fed. Cir. 2008).

When interpreting claims, the court inquires "into how a person of ordinary skill in the art would have understood claim terms at the time of the invention." Pfizer, Inc. v. Teva Pharms., USA, Inc., 429 F.3d 1364, 1372–73 (Fed. Cir. 2005) (citing Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc)).  "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  Id.

Courts generally use three sources to determine the meaning: the claims themselves, the specification, and the prosecution history—these sources are the intrinsic evidence of a claim's meaning.  Z-Man Fishing Prods., Inc. v. Renosky, 790 F. Supp. 2d 418, 426 (D.S.C. 2011) (citing Markman v. Westview Instruments, Inc., 52 F.3d 967, 979–80 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996)).  The specification may provide insight into an inventor's understanding of its invention at the time of patenting, as it might contain an intentional disclaim of claim scope that reveals limits on an inventor's intended invention.  See Phillips, 415 F.3d at 1317; see also White v. Dunbar, 119 U.S. 47, 52 (1886) (noting that it is "unjust to the public, as well as an evasion of the law, to

9

construe [the invention] in a manner different from the plain import of its terms"). The court "should also consider the patent's prosecution history, if it is in evidence." Id. The prosecution history consists of "all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). "While courts may also consider extrinsic evidence in claim construction, 'such evidence is generally of less significance than the intrinsic record.'" Allergan Sales, LLC v. Sandoz, Inc., 935 F.3d 1370, 1373 (Fed. Cir. 2019) (quoting Wi-LAN, Inc. v. Apple Inc., 811 F.3d 455, 462 (Fed. Cir. 2016)).

The parties only dispute the definition of "foam" as used in the '056 Patent—the parties appear to agree that the remaining terms and specifications of the '056 Patent are clear, meaning not subject to interpretation. See ECF Nos. 16-1 at 13; 17 at 14–15; 18 at 5. Plaintiffs propose that "foam" as referenced in the '056 Patent describes "a plastic material which includes air gaps." ECF No. 16-1 at 13. They arrive at this description based on the declaration of their technical expert, Lawrence Fallon ("Fallon"). See ECF No. 16-4, Fallon Decl. ¶ 17. In contrast, Pure Sports consulted ChatGPT to determine that the definition of "foam" is "a substance with a structure characterized by the presence of numerous gas bubbles within a liquid or solid matrix." ECF No. 17 at 14–15. ChatGPT went on to distinguish solid foams as being "materials that have a cellular structure composed of gas-filled voids." Id. at 15.

In reply, plaintiffs emphasize that the plaintiffs' technical expert reviewed the patent and the claim term "foam" and opined that as used in the '056 Patent, "the majority of foams are manufactured using various polymers of plastic, and the term

'foam' commonly describes a plastic material which includes air gaps."  ECF No. 18 at 5

(citing Fallon Decl. ¶¶ 16–17).  Plaintiffs argue that the definition "is not countered in the

Opposition with a declaration or admissible evidence."  Id.  Rather, Pure Sports's reliance

on ChatGPT is defective "as ChatGPT did not exist in 2012," and ChatCPT "has recently

been found to be an unreliable source of information, especially in legal proceedings."[5]

Id. at 5–6.  Thus, plaintiffs conclude that Pure Sports's arguments regarding "foam" are

unsupported by evidence.  Id.

       Claim 1 of the '056 Patent specifies in each of the four illustrated embodiments of

the invention that "high density foam" is used.  ECF No. 1-1, col. 5, ll. 47–54 (fig. 1); id.,

col. 6, ll. 3–6 (fig. 2), 17–18 (fig. 3), 35–39 (fig. 4).  It also specifies where the foam is

used and how it is attached to the bat.  Id.  It does not define foam, besides indicating it is

"high density."  See generally id.  Each of the embodiments includes some amount of

foam inside of the floating insert.  Id.  Thus, the claims do not clearly set forth the

definition of foam.  The specification, read in full, provides little more clarity than the

claims, since foam is not mentioned in either the background of the invention or the brief

summary.  ECF No. 1-1, col. 1, ll. 19–col. 4, ll. 6.  Instead, those sections focus on the

issue which the invention purports to solve: how to improve the rebound effect while

simultaneously dampening vibrations.  Id.  The parties have not filed the prosecution

---

[5] The court agrees that thus far ChatGPT's batting average in legal briefs leaves something to be desired.  See, e.g., Mata v. Avianca, Inc., 2023 WL 4114965, at *15–17 (S.D.N.Y. June 22, 2023) (imposing sanctions on attorneys who relied on ChatGPT for research and whose ChatGPT queries resulted in fabricated legal authority which the attorneys submitted to the court without confirming the authority's veracity).

history, and therefore the court finds that after considering the intrinsic evidence the definition of "foam" remains unclear.[6]  The court turns to extrinsic evidence.

Extrinsic evidence includes such evidence that concerns "relevant scientific principles, the meaning of technical terms, and the state of the art;" it "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."  Phillips, 415 F.3d at 1314, 1317.  "In the course of litigation, each party will naturally choose the pieces of extrinsic evidence most favorable to its cause, leaving the court with the considerable task of filtering the useful extrinsic evidence from the fluff."  Id. at 1318.  The parties have explicitly presented two pieces of extrinsic evidence for the court's consideration.  Plaintiffs rely on the declaration of technical expert Fallon to propose that "foam" as referenced in the '056 Patent describes "a plastic material which includes air gaps."  ECF No. 16-1 at 13; ECF No. 16-4, Fallon Decl. ¶ 17.  Pure Sports requests use of the definition provided by ChatGPT: "a substance with a structure characterized by the presence of numerous gas

---

[6] It is unclear whether the court may consider the prosecution history if it is not already in evidence.  See Phillips, 415 F.3d at 1317 ("In addition to consulting the specification, we have held that a court should also consider the patent's prosecution history, if it is in evidence.").  The court reviewed the prosecution history—meaning all filed documents affiliated with the '056 Patent—from the United States Patent and Trade Office's Patent Center.  In the prosecution history, plaintiffs emphasized that the '056 Patent was unique in that it teaches "using foam, or some other elastic material, as a means to allow an inner tube to move independently within the outer tube."  Prosecution History for Application No. 13/954,901 (emphasis added), Applicant Arguments/Remarks Made in an Amendment at 6 (filed Dec. 24, 2014).  However, beyond that one reference suggesting that foam be used for its elasticity, the prosecution history reiterates that the foam is "high density" without defining what "foam" means. See generally Prosecution History.  At the hearing, the court asked the parties if they had submitted the prosecution history and they confirmed they had not.  ECF No. 24 at 82:21–83:6.  Thus, the court does not rely on the prosecution history in its evaluation of intrinsic evidence.

bubbles within a liquid or solid matrix." ECF No. 17 at 14–15. The court reviews the applicable extrinsic evidence—expert and inventor testimony as well as a technical dictionary—to arrive at a definition of foam.

First, courts are clear that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips, 415 F.3d at 1313 (emphasis added). The filing date of the '056 Patent was in 2013, well before the launch of ChatGPT in November 2022. See ECF No. 18 at 5. Thus, the court would be taking its eye off the ball if it applied the ChatGPT definition in its review of extrinsic evidence. See Phillips, 415 F.3d at 1313.

Second, expert testimony "can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." Id. at 1318. But "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." Id. Additionally, expert testimony is typically procured for the purpose of litigation and therefore can suffer from bias, and "[t]he effect of that bias can be exacerbated if the expert is not one of skill in the relevant art or if the expert's opinion is offered in a form that is not subject to cross-examination." Id. Plaintiffs' expert, Fallon, has four decades of experience as an engineer; he began consulting for the sporting goods industry in 1990, predominately supporting baseball/softball equipment manufacturers and governing organizations. Fallon Decl. ¶¶ 2, 4. He co-founded the

Baseball Research Center which became the official baseball and baseball bat test center for Major League Baseball, the National Collegiate Athletic Association, and the National Federation of High Schools. Id. ¶ 5. In his opinion, "the term 'foam' commonly describes a plastic material which includes air gaps." Id. ¶ 17.

Third, inventor testimony is also helpful extrinsic evidence, which may be used to aid in defining terms. See Phillips, 415 F.3d at 1317. Plaintiffs have filed the declaration of Pegnatori, the inventor credited with the '056 Patent. See ECF No. 16-3. In his declaration, it is apparent that Pegnatori's definition of foam is inclusive of objects "made of plastic-like material" that "may include air gaps or bubbles between layers" which "thereby ha[s] the structure of foam." Pegnatori Decl. ¶ 43. Thus, Pegnatori's declaration accords with the definition provided by Fallon. See id.; Fallon Decl. ¶ 17.

Fourth and finally, the court consults a technical dictionary that predates the date the patent was filed.[7] See Phillips, 415 F.3d at 1318. One technical dictionary published prior to the '056 Patent's filing defines "foam" as "a dispersion of a gas in a liquid or solid." Foam, Academic Press Dictionary of Science & Tech. (Christopher Morris ed., 1992). This accords with the declarations from Pegnatori and Fallon which seek to define "foam" as used in the '056 Patent to include solids with gas or air gaps dispersed within it. See Fallon Decl. ¶ 17; Pegnatori Decl. ¶ 43.

---

[7] The Federal Circuit has repeatedly noted that "judges are free to consult dictionaries and technical treatises 'at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.'" Phillips, 415 F.3d at 1322–23 (quoting Vitronics, 90 F.3d at 1584 n.6).

Thus, the court finds that extrinsic evidence generally suggests that "foam" as understood in the '056 Patent is defined as a plastic material in which gas is dispersed. The court next applies that definition to analyze whether Pure Sports's bats infringe on the elements of the claims of the '056 Patent.

### b. Elements of the Claim

To establish infringement at trial, the plaintiff must prove by a preponderance of the evidence that <u>every limitation</u> set forth in a patent claim is found in the accused product or process either literally or by a substantial equivalent. <u>TDM Am., LLC v. United States</u>, 92 Fed. Cl. 761, 768 (emphasis in original) (citing <u>Laitram Corp. v. Rexnord, Inc.</u>, 939 F.2d 1533, 1535 (Fed. Cir. 1991)), <u>aff'd</u>, 471 F. App'x 903 (Fed. Cir. 2012). This standard is known as the "all elements" rule. <u>See Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.</u>, 520 U.S 17, 29 (1997). The court must compare the construed claim to the accused device or process to determine whether all of the claim limitations are present either literally or by a substantial equivalent. <u>Renishaw PLC v. Marposs Societa' per Azioni</u>, 158 F.3d 1243, 1247–48 (Fed. Cir. 1998). Failure to meet even a single element within a claim precludes a finding of literal infringement. <u>Laitram Corp.</u>, 939 F.2d at 1535.

Plaintiffs argue that Pure Sports's PAD "is a blatant knock-off of Monsta's FIB technology that infringes Plaintiffs' ['056 Patent]." ECF No. 16-1 at 11. Plaintiffs' technical expert Fallon confirmed in his submitted declaration that Pure Sports's PAD design, as embodied in the SIDEWINDER products, infringes the '056 Patent. <u>Id.</u> at 13 (citing ECF No. 16-4, Fallon Decl. ¶ 25). Namely, plaintiffs aver that Pure Sports's bats are identical in design with the exception of the material specified in the third limitation

of Claim 1 of the '056 Patent, and further argue that the difference is immaterial as the changed material functions identically to the foam described in the '056 Patent.  Id. at 13–16.  Pure Sports identifies differences between their bats and the '056 Patent to argue that it has raised substantial questions regarding infringement.  ECF No. 17 at 13–19; see also ECF No. 24 at 81:13–25.  Pure Sports also contends that there is no infringement because Osborne spoke with Pegnatori who purportedly said he was not worried about Pure Sports's bat infringing on his patent.[8]  ECF No. 24 at 37:17–38:19.  The court describes the allegations in greater detail below, focusing on the similarities between the parties' bats in reference to the five limitations included in Claim 1 of the '056 Patent. See ECF No. 1-1, col. 6, ll. 51–col. 7, ll. 8.

First, plaintiffs argue that Pure Sports's bats clearly meet the first limitation of Claim 1 of the '056 Patent as the bats have a tubular frame with a large diameter hitting portion, an intermediate tapering portion, and a handle that is formed as a separate small diameter handle portion, as can be seen above in the photo of the HELLFIRE bat.  Id. at 13–14 (citing Pegnatori Decl. ¶ 37; Fallon Decl. ¶ 13).  Additionally, the hitting portion of the tubular frame of the HELLFIRE bat has the same triple wall structure and total wall thickness as Monsta's DNA bat.  Id. at 14 (citing Pegnatori Decl. ¶¶ 33–35, 40).

---

[8] At the hearing, plaintiffs' counsel objected to the inclusion of this statement as hearsay.  The court allowed it into evidence as a statement against interest.  ECF No. 24 at 38:1–2.  Hearsay is not admissible unless a federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court provide otherwise.  Fed. R. Evid. 802.  The court alternatively could have categorized the statement as non-hearsay either because it was a statement of a party opponent, see Fed. R. Evid. 801(d)(2), or because it was offered to show the statement's impact on Osborne's future actions, see Fed. R. Evid. 802(c)(2) (defining hearsay as a statement offered "to prove the truth of the matter asserted"); United States v. Guerrero-Damian, 241 F. App'x 171, 173 (4th Cir. 2007) ("A statement is not hearsay if it is offered to prove knowledge, or show the effect on the listener or listener's state of mind.").

16

The SIDEWINDER bat features a two-piece composite construction.  Id. (citing Fallon Decl. ¶ 9).  Pure Sports does not contest this description.  See generally ECF No. 17.  The court finds that plaintiffs have shown that they can likely prove at trial that Pure Sports's bats meet this limitation.

Second, plaintiffs argue that the HELLFIRE and SIDEWINDER bats also meet the second limitation as they include an inner tubular insert cylinder that has a circular cross section and generally constant diameter.  ECF No. 16-1 (citing Pegnatori Decl. ¶ 38).  The inner tubular insert appears to be a fiber reinforced resin material, and it has a generally constant outer diameter that is slightly less than the inner diameter of the bat barrel, leaving a void gap along the entire length of the inner tubular insert.  Id. (citing Pegnatori Decl. ¶ 39; Fallon Decl. ¶¶ 10–15).  The inner tubular insert of the HELLFIRE bat has the same thickness and length as the inner barrel of the Monsta DNA bat.  Id. (citing Pegnatori Decl. ¶ 40).  In response, Pure Sports highlights that to violate the second limitation, Pure Sports's rigid ring must be installed so as to form a void gap along the entire length of the insert.  ECF No. 17 at 16.  Pure Sports provided an image of the cross-section of the barrel segment of its SIDEWINDER bat to emphasize that the outer diameter of the carbon fiber ring is substantially identical to that of the inner dimension of the bat frame such that it is in contact with the bat frame.  Id.  Thus, even where a gap may be present, "such a gap would be exceedingly small and practically impossible to maintain a floating arrangement of the rigid ring."  Id. at 17.  Consequently, Pure Sports argues that since plaintiffs have not clearly shown that a void gap exists, they have not met their burden to show that Pure Sports's bats violate the second limitation of Claim 1 of the '056 Patent.  Id. at 17–18.

17

In reply, plaintiffs emphasize that Pure Sports's photo is not dispositive since it could be easily manipulated to eliminate any "void gap" and that the proper proof would be if Pure Sports provided dimensioned design documents. ECF No. 18 at 6–7. When plaintiffs reviewed those specifications, they arrived at the conclusion that a void gap of .04 inches exists between the rigid ring and the bat barrel, since the rigid ring's outer diameter is approximately 1.77 inches and the bat barrel's inner diameter is approximately 1.85 inches.[9] Id.; ECF No. 18-1, Pegnatori 2d Decl. ¶¶ 3–6. Thus, plaintiffs argue that Pure Sports's only argument on this limitation is "merely a manipulation of a photograph." Id. at 7.

At the hearing, plaintiffs established that Pure Sports's bats were certified as non-linear bats by the ASA softball organization. ECF No. 24 at 43:7–19. The USA softball non-linear bat protocol applies to bats for which components not initially in contact later become in contact once deformed. Id. Thus, plaintiffs argue that the certification works to establish that all six of the Pure Sports bats designed with a PAD were certified as having a gap. Id. Additionally, plaintiffs entered into evidence one of Pure Sports's softball bats with a hole cut into the barrel to expose the inner ring of the PAD. Id. (referencing Exhibit 13). Plaintiffs thereafter inserted a piece of paper that circled the inner ring to demonstrate a void gap exists between the outer diameter of the inner ring and the inner diameter of the frame. Id. In response, Pure Sports contested that description to explain that the inner carbon fiber ring and the frame are not concentric

---

[9] The court notes that the difference between 1.85 and 1.77 inches is .08 inches, not .04 inches. Nevertheless, the court cites to the .04-inch gap that Pegnatori identifies, which plaintiffs rely upon. ECF No. 18 at 7; Pegnatori 2d Decl. ¶¶ 3–6.

circles—meaning, to the extent that a gap exists, it is not necessarily around the entire inner ring when the bat is at rest.  Id.

The plain language of the claims specifies that the void gap is "along the entire length of the insert" and "largely of constant width."  ECF No. 1-1, col. 6, ll. 57–64.  Literal infringement requires the accused devices embody all the limitations in the asserted claims.  See Tate Access Floors, Inc. v. Interface Architectural Res., Inc., 279 F.3d 1357, 1366 (Fed. Cir. 2002).  It is unclear whether the gap in Pure Sports's bats has the properties described in the second limitation; it is also unclear from the patent whether, or to what extent, the properties of the void gap described in Claim 1, are important.  Nevertheless, relying on the plain language of the limitation, the court finds that at the preliminary injunction stage plaintiffs have not met the high bar to show a likelihood of success on the infringement claim—specifically, it is debatable whether there is literal infringement of the second limitation.  This conclusion is bolstered by the court's consideration of the third limitation.

Third, plaintiffs claim that the HELLFIRE and SIDEWINDER bats include a spacer[10] within and extending from the insert inner cylinder, which mimics the third limitation of Claim 1 of the '056 Patent.  ECF No. 16-1 at 14 (citing Pegnatori Decl. ¶¶ 41–42; Fallon Decl. ¶¶ 15–18).  Plaintiffs note that the third limitation explains that the spacer be made of foam, as defined above.  Id.  Plaintiffs also observe that the spacers in Pure Sports's bats are "made of plastic-like material," which "may include air gaps or

---

[10] The court notes that plaintiffs describe this feature as a "spacer" while Pure Sports calls it a "positioning sleeve."  See ECF Nos. 16-1 at 14; 17 at 13.  The court uses the terms interchangeably, but generally opts for "positioning sleeve" since that is the preferred term of the company that manufactures that bat.

bubbles between layers thereby having the structure of foam." Id. (citing Pegnatori Decl. ¶ 43; Fallon Decl. ¶¶ 17–18). Plaintiffs emphasize that, to the extent the spacer is not a foam material, it nevertheless performs the same function as the foam limitation of Claim 1—meaning it meets this limitation under the doctrine of equivalents. Id. at 15–16.

Unsurprisingly, Pure Sports highlights this difference and argues that its PAD "cannot infringe [on the '056 Patent] unless the positioning sleeve consists of a foam or its substantial equivalent." ECF No. 17 at 14. As considered above, Pure Sports proposes its own definition of "foam," as defined by ChatGPT, and argues that its PAD cannot be construed as comprising a foam. Id. at 14–15. Rather, "the tubular insert is a single ply fabric consisting of adjacent polyurethane without any air gaps whatsoever, and without any solid material regular and recurring cellular structure composed of gas-filled voids." Id. at 13, 15 (citing ECF No. 17-1, Osborne Decl. ¶ 11). Similarly, the solid ring is composed of rigid unitary plastic which has neither air gaps nor a regular and recurring cellular structure. Id. Thus, "no component of [Pure Sports's] PAD can be considered as containing a foam." Id. Thus, Pure Sports claims there is no literal infringement of Claim 1 of the '056 Patent. Id. at 16.

At the hearing, Osborne of Pure Sports testified under oath that to create the positioning sleeve of the PAD, Pure Sports takes specific care to ensure no gas or water is in the product because its inclusion would delaminate the product. ECF No. 24 at 31:11–32:8. To reiterate, the court defined "foam" as a plastic material in which gas is dispersed; without gas or air gaps the material does not meet the definition of "foam." Consequently, the court finds that plaintiffs have not met their burden to prove they will likely succeed at trial in proving literal infringement of the third limitation. The court

next considers whether the sleeve nevertheless infringes under the doctrine of equivalents.

"Under the doctrine of equivalents, 'a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is equivalence between the elements of the accused product or process and the claimed elements of the patented invention.'" Bondyopadhyay v. United States, 136 Fed. Cl. 114, 122–23 (Fed. Cl.) (citing Warner-Jenkinson, 520 U.S. at 21), aff'd 748 F. App'x 301 (Fed. Cir. 2018). "The doctrine of equivalents prohibits one from avoiding infringement liability by making only 'insubstantial changes and substitutions . . . which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law.'" Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc., 637 F.3d 1269, 1279 (Fed. Cir. 2011) (quoting Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 607 (1950)). The Supreme Court has identified two possible approaches to analyze whether there is equivalence: the "insubstantial differences" approach and the "triple identity test." Bondyopadhyay, 136 Fed. Cl. at 122–23 (citing Warner-Jenkinson, 520 U.S. at 39). The "insubstantial differences" test looks to whether the element asserted to be an equivalent in the accused device is insubstantially different from the claimed element. Id. The "triple identity test" focuses on: (1) the function served by a particular claim element; (2) the way the element serves that function; and (3) the result thus obtained by that element.[11] Id.

Pure Sports argues that plaintiffs' allusion to the doctrine of equivalents is misplaced because its PAD represents an improvement to the claimed product by

---

[11] The triple identity test is also known as the function-way-result test.

eliminating the foam within the insert and instead incorporating a positioning sleeve that does not exert an expansion force on the bat frame.  Id. at 18.  Thus, the PAD avoids "the undesirably muted sound on contact experience with Plaintiffs' FIB technology," and "achieve[s] a more even power distribution along the length of the bat."  Id.  These changes to the design mean that "PAD cannot be considered as infringing any claim of the ['056 Patent] under the doctrine of equivalents."  Id. at 19.  In reply, plaintiffs emphasize that Pure Sports's doctrine of equivalents analysis is defective because it provided no analysis of the "function-way-result" test which applies that doctrine, nor does it cite any supporting evidence that the PAD design does not infringe under the doctrine of equivalents.  Id. at 7.  At the hearing, Osborne testified that the positioning sleeve of the PAD operates to permanently place the reinforcement ring in different positions within the barrel and these changes impact the bat's balance.[12]  ECF No. 24 at 25:3–23; 29:5–16; 45:6–17.

    The claims and specification establish that the foam permits the insert to remain free floating, which improves the rebound effect by "working in total elastic harmony

---

[12] Osborne identified additional differences between the PAD and the FIB that derive from changing the sleeve from foam to thermoplastic polyurethane ("TPU").  ECF No. 24 at 18:20–35:23.  He testified that eliminating the foam decreases the bat's weight, it allows more control over the bat's balance, it improves the sound of the bat upon hitting, and the hollow center improves the air flow within the bat.  Id.  Plaintiffs correctly argued that these changes and comparisons to the FIB were mostly irrelevant as the correct comparison is between the PAD and the claims within the '056 Patent, which are silent as to the bat's hitting sound, the bat's desired weight, the bat's balance, and the bat's airflow.  Id.; see Amstar Corp. v. Envirotech Corp., 730 F.2d 1476, 1481 (Fed. Cir. 1984) ("The law of infringement requires that the asserted claims [of the patent] be compared with the products or processes accused of infringement.").  Thus, the court focuses on the parties' arguments under the substantial equivalents doctrine to determine whether the positioning sleeve nevertheless infringes the limitations of the '056 Patent even though it is not made of foam as is specified in the patent.

with the wall of [the] hitting portion and damping vibrations that reduce the amount of energy being absorbed elastically." See ECF No. 1-1, col. 4, ll. 59–63; Warner-Jenkinson, 520 U.S. at 39. Pure Sports's website explains the purpose of the PAD, saying "When the bat hits the ball the barrel will compress and allow the PAD to amplify the force of the swing. This causes a faster rebound, allowing for hits to go much further than a traditional bat." ECF No. 16-3 at 32. The functional equivalents doctrine, and the two tests used to determine its applicability, "is designed to determine whether the alternative is sufficiently close to the claimed feature that the patentee should be able to capture the equivalent and bar its use by a competitor." Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 493 F.3d 1368, 1380 (Fed. Cir. 2007).

        The court asked both parties at the hearing what the primary function was of the foam in the FIB and the positioning sleeve in the PAD. ECF No. 24 at 83:25–85:11. Plaintiffs explained that the foam holds the inner barrel in the center of the bat, meaning it positions the inner barrel concentrically within the frame. Id. In contrast, Pure Sports explained that their positioning sleeve focuses on keeping the inner ring in position longitudinally—meaning at a particular place within the barrel either closer to the handle portion or to the cap. Id. In fact, the positioning sleeve's placement accounts for the different bats that Pure Sports has available within the non-linear market, as Osborne testified on cross-examination. Id. Plaintiffs entered into evidence a list of the bats certified as non-linear by the USA softball organization, and Osborne testified that all six identified bats had the PAD but different wrappers and different balances—which is achieved by using the positioning sleeve to locate the PAD in varying areas of the barrel. Id.

Thus, under the triple identity test, the FIB's foam keeps the inner ring suspended such that it moves independently of the outer frame, which functions to improve the bat's rebound effect.  See Bondyopadhyay, 136 Fed. Cl. at 122–23.  In contrast, under that same test, the PAD's positioning sleeve primarily works to position the inner ring within the barrel to change the balance of the bat.  See id.  While such a distinction is not dispositive, the divergent primary functions of the foam and the positioning sleeve are such that plaintiffs have not met their burden.  To reiterate, the relevant determination at the preliminary injunction stage is substantial likelihood of success by plaintiffs of their infringement claims, not a legal conclusion as to the ultimate issue of infringement. Amazon.com, 239 F.3d at 1355–56 (emphasis added).

Given the foregoing analysis, it is debatable whether the third limitation is met. The court concludes that plaintiffs have not met their burden and shown a substantial likelihood of success on their claim that the positioning sleeve of the Pure Sports's bats meets the third limitation of the '056 Patent—either literally or by a substantial equivalent.  See Renishaw, 158 F.3d at 1247–48.

Fourth and fifth, plaintiffs claim that the HELLFIRE and SIDEWINDER bats include a knob covering the end of the handle and a cap covering the end of the hitting portion, which are identical to the fourth and fifth limitations of Claim 1 of the '056 Patent.  ECF No. 16-1 at 16 (citing Pegnatori Decl. ¶¶ 44–45; Fallon Decl. ¶¶ 19–22). Pure Sports does not contest this description.  See generally ECF No. 17.  The court finds that plaintiffs have shown that they can likely prove at trial that Pure Sports's bats meet these limitations.

In sum, the court finds that, though plaintiffs have demonstrated a substantial likelihood of success in proving that Pure Sports's bats meet the first, fourth, and fifth limitations of the '056 Patent, they have not met their heavy burden at the preliminary injunction stage as to the second or third limitations.  Thus, plaintiffs have not demonstrated a substantial likelihood of success on their claim of patent infringement at this early stage which guides the court to deny plaintiffs' motion for a preliminary injunction.

### 2. Validity

"[A]n issued patent always enjoys a presumption of validity."  OrthoAccel Techs., Inc., v. Propel Orthodontics, LLC, 785 F. App'x 871, 874 (Fed. Cir. 2019).  If an alleged infringer—here, Pure Sports—attacks the validity of a patent at the preliminary injunction stage, it bears the initial burden to come forward with evidence of invalidity, just as it would at trial.  BlephEx, 24 F.4th at 1399.  Stated differently, Pure Sports is "at bat" on this defense.

At the preliminary injunction stage, the alleged infringer "need only present evidence showing that there is a substantial question of validity despite the presumption of patent validity and [the patent holder's] arguments in favor of validity, such that [the patent holder's] likelihood of success is in question."  Id.  Plaintiffs must demonstrate a likelihood of success that Pure Sports "will not prove that the patent is invalid;" in other words, plaintiffs must demonstrate that Pure Sports's defenses "lack[] substantial merit."  Purdue Pharma L.P. v. Boehringer Ingelheim GMBH, 237 F.3d 1359, 1365 (Fed. Cir. 2001).  Here, Pure Sports argues that the '056 Patent is invalid as anticipated by U.S.

Publication No. 2011/0111894 (the "'894 Publication") and for obviousness based on the same.[13]  The court considers each argument in turn.

### a. Anticipation

For the patent to be valid, it must be "novel," meaning that the claimed aspects of the invention were not previously covered or "anticipated" by inventions that came before it.  See 35 U.S.C. § 102(a)–(b).  "[A] claim is anticipated if each and every limitation is found either expressly or inherently in a single prior art reference."  Celeritas Techs., Ltd. v. Rockwell Int'l Corp., 150 F.3d 1354, 1361 (Fed. Cir. 1998); Hakim v. Cannon Avent Grp., PLC, 479 F.3d 1313, 1319 (Fed. Cir. 2007).  A single prior art reference must "clearly and unequivocally" describe the claimed invention "without any need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of the cited reference."  Net MoneyIN, Inc. v. VeriSign, Inc., 545 F.3d 1359, 1371 (Fed. Cir. 2008) (internal citations omitted).  In other words, "it is not enough that the prior art reference discloses part of the claimed invention, which an ordinary artisan might supplement to make the whole, or that it includes multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention."  Id.

Pure Sports argues that both claims of the '056 Patent are anticipated by the '894 Publication.  ECF No. 17 at 21.  The '894 Publication was purportedly not considered by

---

[13] Plaintiffs provide the United States Patent Application Publication for the '894 Publication in anticipation of Pure Sports's arguments of invalidity.  ECF No. 16-7.  Plaintiffs included the arguments in their motion because Pure Sports has asserted similar defenses in its counterclaims and has also referenced U.S. Patent No. 6,997,826, ECF No. 10 at 11 ¶ 13; U.S. Patent No. 8,197,366, ECF No. 16-6; and U.S. Publication No. 2011/0111892, ECF No. 16-8.  ECF No. 16-1 at 18–19.  The court only considers the '894 Publication in its analysis of anticipation and obviousness, as that is the publication to which Pure Sports confines its arguments for the instant motion.  See ECF No. 17 at 21–24.

the Patent and Trademark Office "during prosecution of the '056 patent."  Id. at 21–22.

The '894 Publication "discloses an embodiment of a baseball bat with internal core

member," as reproduced in the following figures:



'894 publication, FIGs. 6A-6B

Id. at 22 (referencing ECF No. 16-7 at 6).  The '894 Publication is for a bat with similar

barrel, tapering, and handle portions.  Id.  It comprises a tubular insert, "266", positioned

within the barrel portion, "24", and having a circular cross section.  Id.  One embodiment

of the invention involves a multilayer insert, comprising an inner member, "266", and an

outer member, "264."  Id.  Pure Sports says that the '894 Publication "discloses the insert

being separated from the tubular frame by a void gap."  Id. (citing ECF No. 16-7

¶ [0033]).  Pure Sports also indicates that the '894 Publication "discloses wherein the

core member can comprise a foam."  Id. (citing ECF No. 16-7 ¶ [0048]).  Plaintiffs argue

that Pure Sports misreads the '894 Publication; rather, plaintiffs aver that it clearly lacks

a void gap.  ECF No. 18 at 8–9.

The court finds that Pure Sports slightly misstates the embodiment included

within the '894 Publication.  The '894 Publication only references a gap to say that the

invention may have gaps between the internal surface of the frame and the external surface of the core member, but such gaps would be "due to manufacturing tolerances and/or due to intentional inclusion to meet desired design or performance criteria." ECF No. 16-7 ¶ [0033]. The '894 Publication, properly construed, teaches that the exterior surface of the internal core member "may be in direct contact with the interior surface of [the] barrel portion." Id. Moreover, such engagement between the two surfaces "may be a continuous, non-interrupted interface." Id. Pure Sports appears to concede that the referenced gap is different from that included in Claim 1 of the '056 Patent, which requires the void gap be "along the entire length of the insert" and "largely of a constant width." ECF No. 17 at 23 (referencing ECF No. 1-1, col. 6, ll. 59–64). Nevertheless, Pure Sports argues that since plaintiffs claim that PAD infringes on the '056 Patent, and PAD purportedly has no void gap much like the '894 Publication, the scope of Claim 1 "must be broad enough to encompass the embodiment disclosed by the '894 Publication." Id. Consequently, it says the '056 Patent was anticipated by the '894 Publication and therefore is invalid. Id.

Pure Sports swings and misses with this argument for two reasons. First, plaintiffs argue that the specifications of the PAD indicate that a .04 inch void gap exists in Pure Sports's infringing bats. ECF No. 18 at 7. The appropriate place to challenge whether Pure Sports's design infringes on the '056 Patent is under infringement, not validity, and the court provided a clear analysis above, supra III.A.1.b, which addressed the parties' respective arguments surrounding the void gap and infringement. Thus, the court's analysis of whether the '894 Publication anticipated the '056 Patent properly

considers the gap included in the second limitation of Claim 1 of the '056 Patent as a distinguishing factor.

Second, the '056 Patent was not anticipated by the '894 Publication because the clear and explicit language of the '056 Patent references designs similar to the '894 Publication which had "multiple walls that directly abut[] one another" and rejects that design. ECF No. 1-1, col. 2, ll. 9–26. The '056 Patent even considered patents which had "multiple walls that incorporate some sort of gap between the walls" and demonstrated its bat was an improvement on those bats because those referenced designs effectively absorbed energy at multiple points where the separate walls connected or made contact, not just the point of impact. ECF No. 1-1, col. 2, ll. 27–56. Thus, the '056 Patent is unique because "[t]he free floating nature of [the] insert improves the rebound effect in two ways; working in total elastic harmony with the wall of [the] hitting portion and damping vibrations that reduce the amount of energy being absorbed elastically." ECF No. 1-1, col. 4, ll. 59–63. In sum, the void gap is unique and essential to the design of the '056 Patent, and the '894 Publication's failure to include a void gap means it did not anticipate the '056 Patent. See Net MoneyIN, Inc., 545 F.3d at 1371.

### b. Obviousness

A claim is invalid for obviousness "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103. Stated differently, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." KSR Int'l

Co. v. Teleflex Inc., 550 U.S. 398, 416 (2007).  The obviousness inquiry entails

consideration of whether a person of ordinary skill in the art "would have been motivated

to combine the teachings of the prior art references to achieve the claimed invention,

and . . . would have had a reasonable expectation of success in doing so."  Procter &

Gamble Co. v. Teva Pharms. USA, Inc., 566 F.3d 989, 994 (Fed. Cir. 2009) (internal

citation omitted).  The Supreme Court has explained that the obviousness analysis

consists of three factual inquiries: (1) determining the scope and content of the prior art;

(2) ascertaining the differences between the prior art and the claims at issue; and (3)

identifying the level of ordinary skill in the art at the time the invention was made.

Graham v. John Deere Co. of Kan. City, 383 U.S. 1, 17 (1966).

        In determining whether there would have been a motivation to combine prior art

references to arrive at the claimed invention, it is insufficient to simply conclude the

combination would have been obvious without identifying any reason why a person of

skill in the art would have made the combination.  See In re Van Os, 844 F.3d 1359, 1361

(Fed. Cir. 2017).  The required analysis reads the prior art in context, taking account of

"demands known to the design community," "the background knowledge possessed by a

person having ordinary skill in the art," and "the inferences and creative steps that a

person of ordinary skill in the art would employ."  KSR Int'l, 550 U.S. at 418.  The

Supreme Court has explained that various factors may also serve to guard against

slipping into the use of hindsight, and to resist the temptation to read into the prior art the

teachings of the invention at issue.  Apple Inc. v. Samsung Elecs. Co., 839 F.3d 1034,

1052 (Fed. Cir. 2016) (en banc) (citing Graham, 383 U.S. at 36).  These factors are

commonly known as secondary considerations or objective indicia of non-obviousness

and include: "commercial success enjoyed by devices practicing the patented invention," "industry praise for the patented invention," "copying by other," and "the existence of a long-felt but unsatisfied need for the invention." Id.

Pure Sports contends that the claims of the '056 Patent are obvious in view of the '894 Publication. ECF No. 17 at 24. It argues that "where there is some recognized reason to solve a problem, and there are a finite number of identified, predictable solutions, a [person of ordinary skill in the art] has good reason to pursue the known options within his or her technical grasp." Id. Pure Sports posits that two-part core members in non-linear bats "were known for the purpose of creating a more evenly distributed power curve along the barrel of the bat," and the design provided in the '894 Publication meant that "[i]t would have been well within the competence of a [person of the ordinary skill in the art] to pursue alternative arrangement of these components in similar devices." Id. Namely, Pure Sports claims that "merely rearranging the foam outer member within the inner member of the '894 Publication would allow a [person of ordinary skill in the art] to reproduce the device claimed by the '056 Patent." Id. Pure Sports thereby concludes that Claim 1 of the '056 Patent is obvious. Id.

Plaintiffs provide four arguments why Pure Sports has failed to demonstrate that the '056 Patent is invalid for obviousness. First, plaintiffs emphasize that the '894 Publication "describes a two piece insert with an outer portion made of wood and an inner portion made of carbon fibers, with the outer portion engaging the inner surface of the bat barrel." ECF No. 16-1 at 18–19. They argue that the '894 Publication does not "teach[] an inner tubular insert separated from the tubular frame of the bat barrel by a void gap or a foam element functioning to suspend the inner tubular insert within the bat

31

barrel as required by claim 1 of the '056 Patent." Id. at 19.  Second, plaintiffs argue that

Pure Sports's proposal to move the larger diameter outer member inside the smaller

diameter inner member would be an impossibility but more importantly, the suggestion

"improperly uses the disclosure of the '056 Patent as the reason to move or modify the

references [sic] teachings." ECF No. 18 at 9–10.  Third, plaintiffs emphasize that the

obviousness analysis requires the factfinder to ask "whether the relevant skilled artisan

had a motivation to combine two or more pieces of prior art in the way eventually

claimed in the patent at issue." Id. at 10 (citing Samsung Elecs., 839 F.3d at 1047–48,

1051) (emphasis added).  They argue that since Pure Sports has only identified one piece

of prior art—the '894 Publication—there is no second prior art reference that a person of

ordinary skill in the art would have been motivated to combine with the '894

Publication.[14] Id.  Fourth and finally, plaintiffs argue that Pure Sports has not addressed

the required secondary considerations of an obviousness analysis. Id. (citing Graham,

383 U.S. at 17–18 ("Such secondary considerations as commercial success, long felt but

unsolved needs, failures of others, etc., might be utilized to give light to the

circumstances surrounding the origin of the subject matter sought to be patented.")); see

---

[14] The court notes that the Federal Circuit in Samsung Electronics Co., did not explicitly require there be two or more pieces of prior art.  See 839 F.3d at 1047–51.  In practice, the obviousness analysis performed in that case did consider two pieces of prior art.  Id.  Based on the cases before the court, it is unclear whether a party could establish an obviousness argument by combining two references from within a single piece of prior art, such as a single publication.  As the court does not reach its conclusion based on this argument, it declines to determine what is sufficient to constitute prior art references sufficient to establish a viable obviousness argument.  See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig., 676 F.3d 1063, 1068–69 (Fed. Cir. 2012) ("Generally a party seeking to invalidate a patent as obvious must demonstrate by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention.").

also <u>Samsung Elecs.</u>, 839 F.3d at 1048 ("Objective indicia of nonobviousness must be considered in every case where present.").

The specification of the '894 Publication explains that the core—whose exterior is in contact with the interior frame of the barrel portion—"supports the barrel portion and resists radial deformation of the barrel portion when striking an object" by providing local support.  ECF No. 16-7 ¶ [0009].  The support "may reduce peak performance of the barrel portion while still allowing of a large 'sweet spot'" and "may also reduce the aging process or breakdown of the laminate layers . . . such that the performance of the bat does not significantly increase and/or change over its useful life."  <u>Id.</u>  Neither vibration nor rebound effect are mentioned or analyzed.  <u>See id.</u>  The core materials for either the inner or outer member are broadly unspecified, with the '894 Publication noting that "[s]uitable materials include, by way of non-limiting example, plastics, foams, metals, woods, composites, elastomers, polymers, and the like."  ECF No. 16-7 ¶ [0048].  Though the '894 Publication hypothesizes the use of different materials and similarly suggests different ways to place the core member within the barrel portion of the bat, it does not suggest inverting the inner and outer member to improve the bat performance.  <u>See generally</u> ECF No. 16-7.  Thus, an analysis of the '056 Patent suggests that it was not, on its face, obvious in light of the '894 Publication.

Moreover, analysis of objective indicia of non-obviousness also indicates that Pure Sports has not met its burden on this counterargument.  <u>See Samsung Elecs.</u>, 839 F.3d at 1052.  First, Monsta Athletics's bats have achieved commercial success with sales of three to four million dollars annually in the eleven years since its initial startup.  <u>See</u> ECF No. 16-1 at 8–9.  In the past three years alone, Monsta Athletics increased its annual

33

sales to six-to-seven-million-dollar levels, which it attributes to its superior bat technology.  Id.  Second, the Monsta Athletics FIB bats "have received substantial industry praise on Facebook and YouTube channels under the titles of 'Bat Flip bp', 'Fat Guy bp', 'War Stick Bat Review', 'Bat Hound' and 'Bat Boss BP.'"  Id. at 19.  Third, plaintiffs can point to the licensing agreement they previously had with Pure Sports to show that there has been copying by others.  See ECF Nos. 16-1 at 9; 16-3 at 25.  Fourth, plaintiffs included in their specification that their invention enhances the rebound effect and dampens vibrations, which are two ongoing problems identified by bat manufacturers.  ECF No. 1-1, col. 1, ll. 34–col. 3, ll. 65.

Overall, the objective indicia of non-obviousness tend to show that the '056 patent is not invalid for obviousness.[15]  The court finds that Pure Sports has not met its burden to prove the '056 Patent invalid.  See BlephEx, 24 F.4th at 1399.  Stated differently, plaintiffs have demonstrated that Pure Sports's defenses lack substantial merit.  See Purdue Pharma, 237 F.3d at 1365.

In sum, despite overcoming Pure Sports's invalidity argument, plaintiffs nevertheless fail to demonstrate a likelihood of success on the merits required for the court to issue a preliminary injunction.  To reiterate, the court finds that the conflicting evidence before the court undermines the argument that plaintiffs are likely to succeed in proving infringement by Pure Sports of the second and third limitations of Claim 1 of the

---

[15] The court lacks arguments from the parties that would allow it to identify the level or ordinary skill in the art at the time the invention was made.  Thus, the court notes that though such an analysis is a required factual inquiry of the obviousness analysis, the court cannot definitively make such a determination at this time based on the evidence currently before the court.  Thus, the factual analysis primarily rests on determining the scope and content of the prior art and ascertaining the differences between the prior art and the claims at issue.  See Graham, 383 U.S. at 17.

'056 Patent.  Finding a clear bar to the issuance of the preliminary injunction, the court declines to consider the remaining three elements of the preliminary injunction framework.

**B.  Bond**

Plaintiffs request that the preliminary injunction be granted and that the court require a bond amount not exceeding $5,000 because plaintiffs have demonstrated a strong likelihood of success on the merits, and Pure Sports has not yet provided substantive evidence of likelihood of irreparable harm from wrongful issuance of the injunction.  ECF No. 16-1 at 25.   Pure Sports does not address the question of the bond. See ECF Nos. 17, 21.  The court finds that it need not consider the bond since the first factor is not met as plaintiffs have not demonstrated a substantial likelihood of success on the merits of the patent infringement claim.

**IV.   CONCLUSION**

For the reasons set forth above, the court **DENIES** the motion for preliminary injunction.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**October 11, 2023**
**Charleston, South Carolina**

35